The PURPLE ONION, INC., a Georgia Corporation, d/b/a the Purple Onion; Lee & M., Inc., a Georgia Corporation, d/b/a Gentlemen's Quarters; International Follies, Inc., a Georgia Corporation, d/b/a Cheetah III Lounge; Western Business Systems, Inc., a Georgia Corporation, d/b/a Rhetts News and Ashley Art Theatre, Plaintiffs,

v.

Maynard JACKSON, Mayor, City of Atlanta; and Lee Brown, Commissioner, Department of Public Safety, Defendants.

Civ. A. No. C80–1709A.

United States District Court,
N. D. Georgia,
Atlanta Division.

March 31, 1981.

Glenn Zell, Atlanta, Ga., for plaintiffs.

Gary Walker and Roy Mays, Asst. City Attys., Atlanta, Ga., for defendants.

## ORDER

SHOOB, District Judge.

## I. INTRODUCTION

In *Young v. American Mini Theatres*, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976), the Supreme Court upheld as constitutional a Detroit zoning ordinance which provided that adult movie theaters could not locate within 1000 feet of any two other regulated uses.[1] The Court held that the use of the sexually-oriented content of adult movie theaters, adult book stores and certain cabarets as a zoning criterion under the facts in Detroit was not an unconstitutional infringement of First Amendment interests; rather, the Detroit ordinance was a legitimate "time, place, manner" restriction on presumptively protected expression. Since, in Detroit, there was no question of suppression of, or even restriction of access to, this presumptively lawful expression, the

1. Regulated uses in Detroit include, aside from adult motion picture theaters, adult mini theaters, adult book stores and Group 'D' Cabarets, the following: bars, hotels or motels, pawn-shops, pool halls, public lodging houses, secondhand stores, shoeshine parlors, and taxi dance halls. *American Mini Theatres, supra,* 427 U.S. at 52; 96 S.Ct. at 2444.

ordinance passed constitutional muster. The Court indicated that the situation, and perhaps the outcome, would be quite different, *American Mini Theatres, supra,* 427 U.S. at 62, and at 72, n.35, 96 S.Ct. 2448, 2453, n.35; *see also* the opinion of Powell, J., 427 U.S. at 77–79, 96 S.Ct. at 2455–56, "if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech." *American Mini Theatres, supra,* 427 U.S. at 72, n.35, 96 S.Ct. at 2453. The ordinance challenged here, as applied in Atlanta, presents the different situation referred to by the Supreme Court. Because much of the definitional language in the Atlanta ordinance added to the Detroit ordinance is overbroad, and because at least three features [2] of the Atlanta ordinance, each and in combination, have the effect [3] of greatly reducing public access to presumptively protected expression, the ordinance at issue here must fall.

## II. BACKGROUND

This action for declaratory and injunctive relief was filed on October 2, 1980. A hearing on plaintiffs' application for a preliminary injunction was held on October 14, 1980. After several hours of testimony, defendants announced that they would not formally object to the entry of a preliminary injunction. Accordingly, on October 20, 1980, this Court enjoined defendants from enforcing the challenged Atlanta Adult Zoning Ordinance.

Trial on the merits was held from December 1–16, 1980. On January 8, 1981, by

**2.** The 'amortization' out of business of existing adult entertainment establishments; the confining of retail and commercial adult-oriented businesses to light and heavy industrial zones of the city, and one downtown zone, subject to additional distance requirements; and the requirement that no adult-oriented establishment be located "within 500 feet of the boundaries of any residential district, R–1 to A–2, or *property used for residential purposes...*" (emphasis added).

**3.** The cumulative effect of these facets of the ordinance which significantly restrict public access to sexually-oriented expression is not unintended. *See* Defendant's Exhibit 72, and Part III.A. of this order, *infra.*

**4.** The full title of the ordinance is:

order of this Court, two additional exhibits were admitted into evidence. The parties filed their proposed findings of fact and conclusions of law the following week; plaintiffs filed an additional memorandum of law on January 21, 1981. This Court has now considered the testimony, reviewed the voluminous exhibits, including the many maps and photographs, and, pursuant to Fed.R.Civ.P. 52(a), makes the following findings.

## III. THE CHALLENGED ORDINANCE

The Adult Entertainment Zoning Ordinance of the City of Atlanta (hereinafter 'the ordinance') [4] was adopted by the City Council on November 1, 1976 and approved by the Mayor on November 4, 1976. Plaintiffs' Exhibit # 1. Citations to portions of the ordinance will be made both to the appropriate section of the original ordinance, and to the pertinent section of Part 16 (Zoning), of the Code of Ordinances of the City of Atlanta, Georgia, as amended.

### A. Purpose

(1) The Ordinance Itself. Section 1 of the ordinance is called *Finding of Legislative Necessity.* These factual determinations and statements of purpose, set out in nine separate paragraphs, are quite similar to those of Detroit in *Young v. American Mini Theatres, Inc.,* 427 U.S. at 54–55, n.6, and 96 S.Ct. at 2444–45, n.6.

AN ORDINANCE TO AMEND THE ZONING ORDINANCE OF THE CITY OF ATLANTA SO AS TO EXCLUDE ADULT BUSINESSES, AS DEFINED, FROM C–L (COMMERCIAL LIMITED) THROUGH C–3 (COMMERCIAL RESIDENTIAL) DISTRICTS, TO PROVIDE DEFINITIONS FOR ADULT BUSINESSES, (ADULT BOOKSTORES, ADULT ENTERTAINMENT ESTABLISHMENTS, AND ADULT THEATERS), TO ESTABLISH LOCATIONAL REQUIREMENTS FOR ADULT BUSINESSES IN C–4 (CENTRAL BUSINESS) THROUGH M–2 (HEAVY MANUFACTURING) DISTRICTS, TO PROVIDE THAT ADULT BUSINESSES AS DEFINED SHALL UNDER CERTAIN CIRCUMSTANCES CONSTITUTE NONCONFORMING USES; TO REPEAL CONFLICTING LAWS, AND FOR OTHER PURPOSES.

The City Council found that Atlanta has become a leading convention center, and that recent commercial development in the city has greatly increased pedestrian and vehicular traffic. As for adult book stores, adult movie theaters, and adult entertainment establishments (hereinafter collectively called 'adult businesses,' see Part III.B. of this order, infra), the City Council found that they blight and downgrade property values when located in business districts; cause traffic congestion in already concentrated areas of the city 'through the means of taxi cabs'; distract passing motorists through their excessive illumination; require extra police and fire protection from the city; and create excessive noise in the late evening and early morning, causing the surrounding property and those nearby to suffer. In sum, the City Council found that adult businesses have an overall adverse effect on the health and welfare of visitors to the city, citizens of the city and the surrounding neighborhoods.[5] The Council found that these detrimental effects increased when the adult businesses were concentrated in a particular area. Thus, the City Council found it necessary that adult businesses "be subject to special regulations in order to insure that such uses and the effects thereof will not contribute to the blighting of or the downgrading of the surrounding neighborhood; and this ordinance is enacted for the purposes of regulating the uses of such businesses and so as to prevent the further concentration of such uses in any one area of the City."

(2) City Council Development Committee Minutes. These minutes for October 27, 1976, at page six, Defendants' Exhibit # 73, reinforce the findings and purposes of the entire City Council in adopting the ordinance. The minutes note that adult book stores and movie theaters were removed in committee from the 'amortization' provisions still applicable to adult entertainment establishments, see Part III.E. of this order, infra.

(3) Zoning Review Board Minutes. The record of proceedings before the Zoning Review Board from September 21, 1976, pages 14–25, Defendants' Exhibit # 72, represents a wide-open discussion of the Adult Entertainment Zoning Ordinance and the subjects of its sweep. In addition to the ordinance's purposes as expressed above, another purpose for the ordinance was discussed, and that was that the ordinance would help those citizens disgusted by the conduct of these businesses to zone them out of business. See Defendants' Exhibit # 72, at pages 14, 16, 18, 19, and 24. Of further interest are the statements of an associate city attorney, who attended the meeting to represent the position of the Atlanta Law Department. He indicated that the use of the adult zoning ordinance was the "strongest vehicle towards elimination" of adult businesses, and that the City was "hoping for complete eradication" of adult businesses. Defendants' Exhibit # 72, page 21. The city attorney also stated that the effect of the ordinance would be to reduce the number of these establishments.

(4) Note to Ordinance. At the foot of the challenged ordinance is a note of uncertain origin. The note reads as follows.

> NOTE: The purpose of this amendment is to make the zoning ordinance conform to the decision of the United States Supreme Court in Young v. American Mini Theatres, Inc., et al. (Decided June 24, 1976) which approved a similar Detroit zoning ordinance only for businesses coming into existence after the effective date of ordinance. The majority opinion in Young strongly implied that the ordinance would have been held unconstitutional, at least insofar as it applied to book stores and theatres (places of lawful speech), if it applied to those existing establishments, by stating:
>
>> "The situation would be quite different if the ordinance had effect of suppressing, or greatly restricting access to, lawful speech. Here, however, the District Court specifically found that patrons of such businesses, . . ." (The Court is glad to be aware of this danger.)

---

**5.** The City Council also made the unusual finding that adult businesses had a "general overall adverse effect on the health and welfare of the

'(T)he Ordinances do not affect the operation of existing establishments but only the location of new ones.'" (Emphasis added)

Since existing book stores and theatres cannot be suppressed (closed) this proposed amendment changes the zoning ordinance so that it only attempts to suppress (close) existing bath houses.

## B. Definitions of Adult Businesses

Section 2 of the ordinance contains definitions of the three forms of adult businesses for the purpose of zoning adult book stores, adult entertainment establishments and adult theaters.

(1) The definition of an *adult book store*, set out at § 16–1003(56) of the Atlanta Zoning Ordinance, is

any building or structure which contains or is used for the display or sale of books, magazines, movie films, still pictures and any and all other written materials, photographic material, novelties, devices and related sundry items, which are distinguished or characterized by their emphasis on matters depicting, describing or relating to "Specified Sexual Activities" or "Specified Anatomical Areas", or an establishment with a segment or section devoted to the sale or display of such material....

(1) "Specified Sexual Activities" shall mean:

(a) Acts of human masturbation, sexual intercourse or sodomy or any acts of bestiality.

(b) Fondling or other erotic touching of human genitals, pubic region, buttock or breast of either male or female.

(c) Human genitals in a state of sexual stimulation or arousal.

(2) "Specified Anatomical Areas" shall mean:

(a) Less than completely and opaquely covered: (i) human genitals, pubic region, (ii) buttock, and (iii) female breast below a point immediately above the top of the areola; and

(b) Human male genitals in a discernibly turgid state, even if completely and opaquely covered.

(2) An *adult entertainment establishment*, Atlanta Zoning Ordinance § 16–1003(57), is any building

or structure which contains, or is used for commercial entertainment where the patron directly or indirectly is charged a fee to engage in personal contact with or to allow personal contact by, employees, devices or equipment or by personnel provided by the establishment or views a series of dance routines, strip performances or other gyrational choreography provided by the establishment which appeals to the prurient interest of the patron, to include, but not to be limited to bath houses, massage parlors, and related or similar activities.

(3) An *adult theater*, Atlanta Zoning Ordinance § 16–1003(58), is a

[b]uilding or structure which is used for the viewing of performances or activities by others, whether such performances or activities by others [sic], whether such performances are in the form of live shows, motion pictures, slide shows or other forms of photographic or visual display, which are distinguished or characterized by their emphasis on matters depicting, describing or relating to "Specified Sexual Activities" or "Specified Anatomical Areas", as heretofore defined, or an establishment with a segment or section devoted to the sale or display of such material.

## C. Zone Restrictions

Any building or structure which meets any of the definitions of adult businesses must hereafter locate in one of three zoning districts: C–4, the Central Business District; M–1, Light Industrial District; and M–2, the Heavy Industrial District. *See* the ordinance, section 2; and the Atlanta Zoning Ordinance, §§ 16–20002(34), 16–21003, and 16–22003(a). Existing adult businesses in zoning districts other than C–4, M–1 and M–2 are covered generally by Chapter 24 of the Atlanta Zoning Ordinance, Non-Conforming Uses of Land, Non-Conforming Structures, Non-Conforming Uses of Structures and Premises, § 16–24001 *et seq.*

#### D. Linear Restrictions

Within the C–4, M–1 and M–2 districts of the City of Atlanta, adult businesses are subject to certain linear restrictions upon where they may locate. Section 6 of the ordinance provides:

a. No adult bookstore, adult entertainment establishment, or adult theater, as defined in this ordinance and herein referred to as "regulated uses," shall be located within 1,000 feet of any other such use, or located within 500 feet of the boundaries of any residential district, R-1 (residential) to A–2 (apartment), or property used for residential purposes or within 500 feet of any permanent structure used as a church or place of religious worship.

b. Such restriction as to linear distance requirements, as between or among adult bookstores, adult entertainment establishments, or adult theaters, shall apply to compartmentalized buildings or structures, the same as if such compartmentalized buildings or structures were one (1) building structure. Such restriction, as related to distance requirements, shall be enforced in any and all directions, including, but not limited to, north, east, south, west, and, where vertical or horizontal distance measurements are required such restrictions shall likewise apply.

Atlanta Zoning Ordinance, §§ 16–20002(34), 16–21003, and 16–22003(a). The ordinance also provides that the board of zoning adjustment "shall have no power or authority to grant a variance in favor of any adult entertainment establishment with respect to waiving or excepting the linear distance requirements as between similar regulated uses or any structure used for church, school or residential purposes." Atlanta Zoning Ordinance, § 16–28002(e).

#### E. 'Amortization' of Non-Conforming Adult Entertainment Establishments

Any adult entertainment establishment existing when the ordinance was passed, which establishment was within the prohibited linear distances from another adult business or a church, residential district or property used for residential purposes, was given four years, at most, to terminate operations. (Non-conforming adult book stores and theaters are not 'amortized' by the ordinance.) The ordinance provided that a non-conforming adult entertainment establishment would be permitted to continue

until it is terminated as hereinafter provided, unless sooner terminated voluntarily. The non-conforming uses, buildings or structures, as herein defined, shall not be increased, enlarged, expanded, extended, or altered except by changing the use of such structures to a use permitted in the district in which it is located. By amortization, the right to maintain such a non-conforming use shall terminate in accordance with the following schedule:

| Any use, which on the date such use becomes non-conforming, would have the following value, as hereinafter defined: | Shall be terminated within the following period after the use becomes non-conforming: |
| --- | --- |
| $0 to $3,000................... | 1 year |
| 3,001 to 6,000................. | 2 years |
| 6,001 to 15,000................ | 3 years |
| 15,000 or more................. | 4 years |

The "value," above set forth, is hereby defined to mean the fair market value of such lease as of the date such use becomes non-conforming and the amounts expended for the improvements with respect to such use, exclusive of the fair market value of such structure, if owner occupied, and exclusive of any profits of the business conducted in such structure. Atlanta Zoning Ordinance, § 16–24004(9). The four-year maximum period for termination expired on November 4, 1980. As noted in Part II of this order above, this Court has entered a preliminary injunction

against any further enforcement of the ordinance.

### F. Enforcement and Penalties

Responsibility for enforcing the Atlanta Zoning Ordinance is entrusted to the director of the City of Atlanta's bureau of buildings. All city officers, and particularly members of the bureau of police services, are expected to assist the director of the bureau of buildings by reporting any apparent zoning violations. Appeals from decisions of the director of the bureau of buildings lie to the board of zoning adjustment. Atlanta Zoning Ordinance, § 16–34001. *See also* Chapter 28 of the Atlanta Zoning Ordinance, § 16–28001 *et seq.*

Compliance with zoning provisions is expressly made a prerequisite to obtaining a city business license from the department of finance.[6]

Violation of any zoning provision is punishable as an offense, as provided in § 16–37001 of the Atlanta Zoning Ordinance. That section provides:

> Any person, firm or corporation violating any of the provisions of the Zoning Ordinance of the City of Atlanta, as amended, shall be deemed guilty of an offense and upon conviction thereof shall be punished by a fine of not less than $25 nor more than $500 or imprisonment for not less than 60 days nor more than six (6) months. Each day's continuance of a violation shall be considered a separate offense. The owner of any buildings or premises or parts thereof, where anything in violation of this part shall be placed or shall exist, and any architect, builder, contractor, or agent of the owner who may have assisted in the commission of any such violation shall be guilty of a separate offense.

### G. Other Provisions

The ordinance provides that should any portion of the ordinance be struck down as unconstitutional, either on its face or as applied, it is the intent of the City Council that the rest of the ordinance survive. Adult Entertainment Zoning Ordinance, § 9.

### H. Related Ordinances

(1) Atlanta's adult business licensing ordinance, which was passed about the same time as the instant adult business zoning ordinance, was challenged in a series of cases before the Honorable William C. O'Kelley of this Court. In an order dated April 29, 1980, Judge O'Kelley struck down most of the adult business licensing provisions on First Amendment grounds.[7]

(2) The parking requirements for Atlanta's different zoning districts and additional linear restrictions for establishments licensed to dispense liquor will be discussed in Parts IV.C.(2) and V.D. of this order, below, as they concern the question of access.

## IV. FINDINGS OF FACT

### A. The Parties

Three of the plaintiffs, The Purple Onion, Inc., d/b/a The Purple Onion, Lee and M., Inc., d/b/a Gentleman's Quarters, and International Follies, Inc., d/b/a Cheetah III Lounge, are night clubs or adult cabarets. Two of them presently have liquor licenses; the third has applied to the City of Atlanta for a liquor license. These plaintiffs present live entertainment consisting of sexually-oriented shows and dances performed by nude dancers. Complaint, page three. The owner of Cheetah III Lounge testified that his establishment presented "Stylish Nude Entertainment." The Court did not consider it necessary to view any of these performances.

The fourth plaintiff, Western Business Systems, Inc., d/b/a Rhetts News, runs a book store. "[M]any of its books and magazines and meterials [sic] are sexually orient-

---

6. See Part III.H.(1) of this order, *infra*, concerning the fate of Atlanta's adult business licensing ordinance.

7. *Ellwest Stereo Theatre, Inc. v. Jackson, et al.* C79–975A, C79–987A, C79–1012A, C79–1013A, C79–1069A, C79–1070A and C79–1110A (N.D. Ga.1980). The case is currently being appealed to the Fifth Circuit Court of Appeals.

ed . . ." Complaint, page three. None of this plaintiff's merchandise was admitted into evidence. Plaintiff Western Business Systems, Inc., also operates the Ashley Art Theatre, which shows sexually-oriented films. Complaint, page three. The Court did not view any of the Ashley Art's fare.

Defendant Maynard Jackson is the Mayor of Atlanta. He is sued in his official capacity. Defendant Lee Brown, Commissioner of the Department of Public Safety, is likewise sued in his official capacity.

As for the three plaintiffs who provide live, nude entertainment, the testimony was uncontradicted that they do their best business between the hours of 8:00 pm and 4:00 am. The three owners who testified also indicated that they would not be able to stay in business without a liquor license.

There was conflicting testimony concerning the amount of space required for a building containing an adult entertainment establishment and the size of the lot of land necessary when parking space was considered. See testimony of Mr. Robert McArthur, December 1, 1980 (Excerpted Testimony, Volume I, pages 6–13); but see testimony of John Earnest Drake, December 15, 1980 and Defendants' Exhibit # 68. The Court finds that a successful adult entertainment establishment would require a building size of 3,000 to 5,000 square feet of interior space, and a parcel of land of 15,000 to 20,000 square feet.

Other testimony at the trial indicated that it would cost in excess of $250,000 to buy appropriate real property and construct a building and parking suitable for an adult night club or cabaret. Owners of adult entertainment establishments have been reluctant to make such a large investment in an adult night club because of legal uncertainties concerning their businesses and hostility from certain sections of the public, and prefer to remodel existing buildings leased or purchased for their operation.

B. Other Adult Businesses in Atlanta

At the time of trial, there were 42 or 43 business establishments in Atlanta which were primarily or exclusively sexually-oriented in their subject matter. Testimony of Mr. John R. Collicott, October 14, 1980. See also Defendants' Exhibit # 26. (The green pins on this map indicate these existing sexually-oriented businesses.)

These existing businesses are clustered in six relatively desirable, heavily-trafficked, retail and commercial areas of the City of Atlanta: Buckhead; Northeast Atlanta along Piedmont Avenue and Cheshire Bridge Road; the downtown business district; the Midtown business district, along Peachtree Street between 10th Street and 14th Street; the Stewart Avenue-Lakewood Freeway area of South Atlanta; and an area east of downtown along Ponce de Leon Avenue (also a major Atlanta thoroughfare). Only two of these areas contain any sites properly zoned for future location of additional adult businesses. The question of whether there are any available sites in those areas is discussed in Part IV.D. of this order, below.

C. M–1, M–2 and C–4 Districts

(1) The C–4 central business district is the heart of the City of Atlanta. It contains most of Atlanta's taller buildings, and much retail and commercial business, many banks and considerable office space. Parking space is at a premium in the downtown area. The downtown area also has many old churches within its limits. Most of Atlanta's larger hotels are also in this district. Georgia State University, Underground Atlanta, the State Capitol, and a number of hospitals are also within the central business district.

In addition to the uses above in the downtown area, many of Atlanta's adult businesses are there. Besides these businesses that provide exclusively or primarily sexually-oriented live entertainment, movies or books and novelties, certain of the downtown hotels, including the Atlanta downtown Hyatt Hotel and the Atlanta downtown Marriott Hotel, show movies in their rooms for an extra charge that are R-rated, sexually-oriented and fairly explicit. See Plaintiffs' Exhibits 34 and 35; testimony of Mr. Robert T. McWhorter and Mr. James T. Galenhart, December 15, 1980. There are also newsstands and book stores throughout the downtown area, some of which contain

as a portion of their stock sexually explicit literature.[8] Certain of Atlanta's downtown non-adult movie theaters also, from time to time, exhibit R-rated and X-rated sexually-oriented motion pictures.

(2) *M–1, the City of Atlanta Light Industrial District*, was established to "provide areas within the city for the manufacture, storage, sale and distribution of goods, the conduct of related commercial and industrial activities, so as to provide for the continued growth of the economic base of the city. Those uses which are obnoxious or offensive by reason of emission of odor, dust, smoke, gas, noise or vibration are not allowed." Atlanta Zoning Ordinance, § 16–21002. For industrial uses in the district, parking space is required as follows: one parking space "for each 600 square feet of floor area or for each three (3) employees on any working shift, whichever is greater, and in addition, standing space shall be provided to accommodate the trucks and other vehicles in custody of the industry." Atlanta Zoning Ordinance, § 16–21004(b).

(3) *M–2, the City of Atlanta Heavy Industrial District*, was established to "provide areas within the city for the manufacture, storage, sale and distribution of goods, the conduct of related commercial and industrial activities, so as to provide for the continued growth of the economic base of the city." Atlanta Zoning Ordinance, § 16–22002. Obnoxious and offensive uses are not specifically prohibited, although certain uses require special permits. *Id.*, § 16–22003(b). The parking regulations are the same in M–2 as they are in M–1. *Id.*, § 16–22004.

M–1 and M–2, the City of Atlanta's industrial districts, share to a lesser or greater extent the following characteristics. These explain why there are few, if any, adult or other retail uses located in industrial areas. Industrial areas are not well lit; there is little vehicular or foot traffic at night, when adult businesses ordinarily do

their best business; the areas are considered to be less safe than heavily-travelled areas; access by road to and from residential areas and other retail and commercial areas is poor; existing buildings in industrial areas (many of them warehouses) available for lease are generally ill-suited structurally for adult businesses; the industrial districts are usually some distance from the central business district, with its large hotels and tourist and convention trade; and parking in industrial areas is generally insufficient for retail uses, particularly for adult night clubs and cabarets. Many of the vacant lots in these industrial areas are much too large for retail use. In certain areas of the industrial district, heavy industrial uses, such as sewage treatment plants, brick works, petroleum refineries, petroleum storage facilities, and railroad sidings, would make a successful retail venture nearby virtually impossible.

## D. Effect of the Ordinance

If this Court lifts its injunction, the ordinance at issue here will significantly reduce public access to sexually-oriented material and entertainment in Atlanta. *See* the factual findings in (3) below as to sites for adult businesses in C–4, M–1 and M–2 districts.

(1) Adult book stores and movie theaters presently in zoning districts other than C–4, M–1 and M–2 would become non-conforming uses under the adult business zoning ordinance. This would subject these businesses to the restrictions in Chapter 24 of the Atlanta Zoning Ordinance, § 16–24001 *et seq.*, which restrictions include, among others, a ban on enlarging, extending or reconstructing such uses. *Id.*, §§ 16–24001(a), 16–24004(1). Normal attrition would slowly reduce the number of adult book stores and theaters in districts other than C–4, M–1 and M–2, and such new businesses could locate only in C–4, M–1 and M–2 districts.

---

8. This Courthouse is also in the downtown business district. The Court takes judicial notice of the fact that in certain cases presently pending in the United States District Court for the Northern District of Georgia, the records in the Clerk's Office contain exhibits which are sexually explicit. In the case of *The Pillsbury Company v. Milky Way Productions, Inc., et al.*, C78–679, for example, Plaintiff's Exhibits # # 10–21 are issues of the magazine entitled "SCREW" from 1978 and 1979.

(2) Adult entertainment establishments, on the other hand, are "amortized" out of areas in which they are non-conforming uses under the ordinance. The testimony at trial was that there are between 12 and 15 night clubs in Atlanta that are clearly 'adult entertainment establishments.' All of these night clubs, except the Tattletale Lounge,[9] are located in areas where they would be non-conforming uses under the ordinance. Thus, all but one of them would have to close their present locations and move to sites in C–4, M–1 and M–2, in compliance with the ordinance's distance requirements, in order to stay in business. If there are not sufficient sites available in C–4, M–1 and M–2 districts in Atlanta for adult businesses, then permitting the challenged ordinance to go into effect would significantly reduce, and possibly eliminate altogether, public access to sexually-oriented live entertainment in Atlanta.

(3) Much of the testimony at the trial dealt with the question whether or not there are available sites for adult businesses in the M–1, M–2 and C–4 districts of the city. The city contends that it need not make sure that there exist sufficient available sites for these adult businesses, but it also contends that there are no less than 81 sites adequate for adult entertainment establishments. The parties, naturally, differ as to the meaning of 'available' and 'adequate' sites; they also differ on the question of how the availability and adequacy of sites for adult businesses relates to the issue of public access to sexually-oriented fare and material.

While this order does not examine, one by one, the 81 sites suggested by defendants for adult businesses, the Court has carefully reviewed all the maps, documentary evidence, photographs and testimony in reaching its findings of fact. The Court finds, for the reasons set forth in the following paragraph, that all but ten or so of the 81 sites are wholly unacceptable as sites for adult businesses; and of these ten, no more than three or four of the sites are sites

which a reasonably prudent investor owning an adult-type business would consider as a possible site to establish such a business. In making these findings, the Court did not consider (1) the price of the land or (2) whether the land was presently for sale.

A few of the 81 sites are not acceptable for adult businesses because they are located within 500 feet of a church, within 1,000 feet of another adult business, or within 500 feet of the boundary of a residential district or property used for residential purposes. In many instances, the suggested site was wholly unsuited for retail or commercial use by an adult business because the lot was too small, or because its shape made it impossible to place a building of the proper size on it. One site had an easement through the middle; another had an easement for electricity transmission wires making it impossible to build any structure. Several sites were 20–30 feet below street level, making it impossible to use the land for retail or commercial use. At least one site was in a flood plain.

A substantial number of the defendants' proposed sites were portions of much larger tracts of land. Testimony at the trial indicated that some owners of large tracts were unwilling to break up the parcel. Other owners were not interested in selling to another business for a retail use. Still other owners (whether or not the tract was large) would not sell to an operator of an adult business.

A few of the sites were not very accessible to automobile traffic. There was testimony at the trial that one of the sites had access by rail only. Another was served by a dirt road. In several instances, the proposed site was unsuitable for retail or commercial use due to nearby noxious uses. One site was in the midst of a group of large petroleum storage tanks; another site was contiguous to a City of Atlanta sewage treatment plant.

Finally, a large number of the proposed sites were simply not available and will

---

**9.** Even the Tattletale Lounge may be a non-conforming use, since it is within 1000 feet of a motel in which there is a permanent residence. The question whether such a motel is "property used for residential purposes" under the ordinance is discussed briefly in Part V.G.(2) of this order, *infra*.

remain unavailable for the foreseeable future. Some of the proposed sites were employee parking lots for large, permanent manufacturing facilities or other permanent businesses. Other suggested sites were occupied by buildings in which a substantial business was located. In still other instances, certain characteristics of the property owners made it highly unlikely that they would sell the land anytime soon, much less to an operator of any adult business. It is highly unlikely, for example, that the City of Atlanta will sell or lease any of its real property to plaintiffs. It is also unlikely that Southern Railway will sell or lease any of its railroad right-of-way property. Likewise, it is improbable that the Chattahoochee Brick Company will sell or lease any of the land on which its brick-making facilities are located for one of these regulated adult type uses. While it is possible that a different conclusion could be drawn from the evidence, this Court finds the proposed locations for the most part to be either unavailable, unusable, or so inaccessible to the public that for all practical considerations they amount to no locations.

In conclusion, the effect of the ordinance on public access to sexually-oriented entertainment and material would be (1) to immediately, and drastically, reduce public access in Atlanta to the sort of live, sexually-oriented entertainment presented by three of the plaintiffs; and (2) to gradually reduce the availability to the public in Atlanta of movies, books and paraphernalia characterized by emphasis on sex.

## V. CONCLUSIONS OF LAW

### A. Jurisdiction

This is a suit for declaratory and injunctive relief. Plaintiffs claim that the challenged Adult Entertainment Zoning Ordinance of the City of Atlanta, on its face and as applied to them, violates rights secured to them by the First, Fifth and Fourteenth Amendments to the Constitution of the United States. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1343(3).[10]

### B. Standing

Plaintiffs' standing to sue is addressed in the context of each separate challenge to the ordinance. *See Genusa v. City of Peoria*, 619 F.2d 1203, 1209 (7th Cir. 1980).

### C. First Amendment Protection

■ The plaintiffs in this case sell books and magazines, show motion pictures and put on live nude entertainment. Plaintiffs concede that their for-profit businesses are sexually-oriented. That expression is sexually-oriented, however, does not affect its First Amendment protection.[11] "The portrayal of sex, e. g., in art, literature and

---

**10.** 28 U.S.C. § 1343:

> *Civil Rights and Elective Franchise*
> The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:
>
> .    .    .    .    .
>
> (3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; ...

This action is authorized by 42 U.S.C. § 1983, which provides in pertinent part—

> Civil action for deprivation of rights
> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other

person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

**11.** Unless, of course, the expression is obscene. *See Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973). Expression is obscene only if the trier of fact determines that (a) the average person, applying contemporary community standards, would find that the work, taken as a whole, appeals to the prurient interest; (b) the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) the work taken as a whole lacks serious literary, artistic, political or scientific value. *Id.*, 413 U.S. at 24, 93 S.Ct. at 2615. There is no contention here that any expression is obscene under the *Miller v. California* standard.

scientific works, is not itself sufficient reason to deny material the constitutional protection of freedom of speech and press. Sex, a great and mysterious motive force in human life, has indisputably been a subject of absorbing interest to mankind through the ages; it is one of the vital problems of human interest and public concern." *Roth v. United States*, 354 U.S. 476, 487, 77 S.Ct. 1304, 1310, 1 L.Ed.2d 1498 (1957) (footnotes omitted), cited in *American Mini Theatres, supra*, 427 U.S. at 87, 96 S.Ct. at 2460 (Stewart, J., dissenting).

■■■ Nor does the fact that plaintiffs are engaged in commercial activity affect the level of protection afforded the expression.[12] The First Amendment embraces the publication, circulation and distribution of books and films.[13]

And "[i]n like manner dance as a form of expression is entitled to protection."[14] Without having viewed the live 'stylish nude entertainment' that several of plaintiffs present (in order to determine whether it is the sort of "customary 'barroom' type of nude dancing" that the Supreme Court has indicated may involve only the barest minimum of protected expression[15]), at this point the Court must afford the three plaintiffs who provide live nude entertainment "the same presumption of non-obscenity as the purveyors of printed or projected expressions receive."[16]

D. Void for Vagueness

Plaintiffs do not seriously contend that any vagueness in the ordinance creates

doubt that they are adult businesses within the definitions of the ordinance. That argument was foreclosed by the Supreme Court in *Young v. American Mini Theatres, Inc., supra*, 427 U.S. at 58–59, 96 S.Ct. at 2446 ("even if there may be some uncertainty about the effect of the ordinances on other litigants, they are unquestionably applicable to these respondents.").

■■■ Plaintiffs here also seek to challenge the ordinance as unconstitutionally vague[17] on behalf of others. The Supreme Court has occasionally relaxed ordinary standing requirements to permit persons whose own speech was unprotected to challenge statutes affecting communication protected by the First Amendment. *American Mini Theatres, supra*, 427 U.S. at 59, 96 S.Ct. at 2447. But in order for the Court to permit plaintiffs to challenge vagueness in the ordinance on behalf of others, the Court must conclude (a) that the ordinance's deterrent effect on legitimate expression is "both real and substantial" and (b) that the ordinance is not readily subject to a narrowing construction by local courts. *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 216, 95 S.Ct. 2268, 2276, 45 L.Ed.2d 125 (1975); *Young v. American Mini Theatres, Inc., supra*, 427 U.S. at 59–60, 96 S.Ct. at 2447. Since virtually all of the alleged vagueness offered by plaintiffs (e. g., "church," "substantial," "significant," and "characterized by an emphasis on") is 'readily subject to a narrowing construction,' the Court concludes that plaintiffs lack standing to challenge this ordinance for vagueness on behalf of others not parties to this action.

12. *Ellwest Stereo Theatre, Inc. v. Jackson, supra* n.8, at page 4 (O'Kelley, J.).

13. *See Lovell v. Griffin*, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938), and *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098 (1952).

14. *Ellwest Stereo Theatre, Inc. v. Jackson, supra*, at page 5. *See also California v. LaRue*, 409 U.S. 109, 116–18, 93 S.Ct. 390, 396–97, 34 L.Ed.2d 342 (1972) and *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932, 95 S.Ct. 2561, 2568, 45 L.Ed.2d 648 (1975).

15. *Doran v. Salem Inn, Inc., supra*, 422 U.S. at 932, 95 S.Ct. at 2561; *California v. LaRue, supra*, 409 U.S. at 118, 93 S.Ct. at 397.

16. *Ellwest Stereo Theatre, Inc. v. Jackson, supra*, at page 5. In light of the above, the Court concludes that the expression and entertainment offered by plaintiffs are "entitled to undiluted First Amendment protection." *Hart Book Stores, Inc. v. Edmisten*, 450 F.Supp. 904, 906 (E.D.N.C.1978) (dictum), *reversed*, 612 F.2d 821 (4th Cir. 1979), cert. den. —— U.S. ——, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980).

17. "[A] law forbidding or requiring conduct in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates due process of law." *Baggett v. Bullitt*, 377 U.S. 360, 367, 84 S.Ct. 1316, 1320, 12 L.Ed.2d 377 (1964).

■ One aspect of plaintiffs' vagueness argument has some merit. This argument is that, since plaintiffs cannot locate within 1,000 feet of any other adult business, and since so many other establishments appear to fall within the definitions of adult book stores, adult theaters, and adult entertainment establishments, plaintiffs do not know where they can locate under the ordinance; hence it is unconstitutionally vague. (And, since this 'vagueness' affects their rights, plaintiffs have standing to raise this argument.) However, because the Court concludes that this ordinance's chief constitutional failing is overbreadth, not vagueness, this challenge is taken up in Part V.E.(3), *infra*.

E.   First Amendment Overbreadth [18]

■ (1) Standing.  A law may be declared void on its face for overbreadth if it " 'does not aim specifically at evils within the allowable area of [government] control, but ... sweeps within its ambit other activities that constitute an exercise' of protected expressive or associational rights."  L. Tribe, *American Constitutional Law*, § 12–24, page 710, citing *Thornhill v. Alabama*, 310 U.S. 88, 97, 60 S.Ct. 736, 741, 84 L.Ed. 1093 (1940).  Because laws which are overbroad tend to 'chill' the exercise of important First Amendment rights, third parties whose own speech may be unprotected are generally permitted to attack overbroad statutes on behalf of others.[19]  "Those whose expression is 'chilled by the existence of an overbroad or unduly vague statute cannot be expected to adjudicate their own rights, lacking by definition the willingness to disobey the law."  *Tribe, supra*, § 12–20 at page 720.  The importance of the interests at stake is also a factor tending to explain the relaxation of ordinary standing principles in these cases.  This Court concludes that plaintiffs in this action have standing to attack this ordinance as void on its face for overbreadth.

■ (2) Overbreadth.  Courts may entertain facial overbreadth claims in cases where, as here, laws, "by their terms, purport to regulate the time, place, and manner of expressive or communicative conduct," *Broadrick v. Oklahoma*, 413 U.S. 601, 613, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973).  But since application of the overbreadth doctrine—by enjoining enforcement of the ordinance altogether, either permanently or until amended—is such "strong medicine," it is done "sparingly and only as a last resort," *id.*  Facially overbroad statutes may be invalidated *only* when

(a) the overbreadth of the statute is both real and substantial;  *and*

(b) no limiting construction is possible.

(a) To be sufficiently overbroad to be invalid on its face, a statute's "deterrent effect on legitimate expression" must be real and substantial, *Young v. American Mini Theatres, Inc., supra*, 427 U.S. at 60, 96 S.Ct. at 2447, "judged in relation to the Statute's plainly legitimate sweep."  *Broadrick, supra*, 413 U.S. at 615, 93 S.Ct. at 2918.  The ordinance contains definitional language here which clearly meets this standard of real and substantial overbreadth.

The definition of an adult book store under this ordinance is "a building or structure which contains ... books, magazines [etc.] ... which are distinguished or characterized by their emphasis on matters depict-

---

**18.** For discussions of the First Amendment Overbreadth Doctrine, *see* Note, 83 Harv.L. Rev. 844 (1970); J. W. Torke, *The Future of First Amendment Overbreadth*, 27 Vand.L.Rev. 289 (1974); and L. Tribe, *American Constitutional Law* §§ 12–24 through 12–30 (1978).

**19.** [T]he Court has altered its traditional rules of standing to permit—in the First Amendment area—"attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." *Dombrowski v. Pfister*, 380 U.S. at 486, 85 S.Ct. at 1121.  Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause other not before the Court to refrain from constitutionally protected speech or protection. *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973).

ing, describing or relating to "Specified Sexual Activities" or "Specified Anatomical Areas, . . . " This definition lacks precision. It includes, of course, the book store operated by plaintiff Western Business Systems, Inc. But the ordinance defines an 'adult book store' so broadly that an adult book store need not even be a commercial establishment. It also includes any building, including, for example, a dwelling, which contains covered sexually-oriented magazines as defined in the ordinance. The many Atlanta subscribers to Playboy and other similar magazines would be amazed to find that their homes are considered to be adult book stores and subject to the zoning restrictions under the ordinance.[20]

Thus, the definition of 'adult book store' in this ordinance not only covers the 'yellow-front' book stores at which it was directed and which, under *Young v. American Mini Theatres, Inc.*, it may legitimately disperse by zoning; it also by its terms includes many buildings and structures, whether in the business of selling books or not, which are not proper subjects of this ordinance. The City's response to this conclusion is discussed in Part V.E.(3) of this order, below.

In similar fashion, the ordinance's definition of an adult theater is also clearly overbroad. This definition covers buildings or structures "used for the viewing of performances by others, whether such performances are in the form of live shows, motion pictures, slide shows or other forms of photographic or visual display, which are distinguished or characterized by their emphasis on matters depicting, describing or relating to 'Specified Anatomical Areas.'" Under this definition, an adult theater need

not be a commercial establishment, or even a movie theater, to be an adult theater subject to the strictures of this ordinance. This definition includes homes receiving certain R-rated movies by cable or homes where the homeowner's taste in slides or 16 millimeter film runs to the salacious.

That this definition is vastly overbroad was illustrated by testimony at the trial. Several witnesses testified that they had taken rooms in downtown Atlanta hotels overnight. For an extra fee of between $4 and $5, these patrons of some of Atlanta's finest hotels were permitted to view motion picture performances which, in the opinion of the witnesses, were distinguished or characterized by their emphasis on specified sexual activities and specified anatomical areas. The Court need only take judicial notice of the fact that the Hyatt Hotel and the Atlanta Marriott Hotel are buildings to conclude that they are adult theaters as defined by the ordinance.

The definition of an adult entertainment establishment is flawed, although not quite as badly as the adult theater and book store definitions. An adult entertainment establishment must at least be, or contain, a commercial establishment. Such an establishment is "any building or structure which contains, or is used for commercial entertainment where the patron directly or indirectly is charged a fee to engage in personal contact with or to allow personal contact by, employees, devices or equipment or by personnel provided by the establishment or views a series of dance routines, strip performances or other gyrational choreography provided by the establishment which appeals to the prurient interest of the patron,[21] to include, but not be limited to bath

---

**20.** The definition of 'adult book store' in this ordinance likewise includes the Richard B. Russell Federal Building, in which this Court has its chambers and courtroom, since, as previously noted, the Clerk's Office in this building has on file in some of its cases certain magazines which are "distinguished or characterized by their emphasis on matters depicting, describing or relating to 'Specified Sexual Activities' or 'Specified Anatomical Areas.'"

**21.** Plaintiffs strenuously contend that the use of this 'prurient interest of the patron' lan-

guage, apparently taken from the first prong of the *Miller v. California* obscenity test (*see* n.11 of this order, *supra*), makes this definition hopelessly vague in that plaintiffs cannot possibly know what will appeal to the prurient interests of their patrons; thus, this definition in the ordinance provides plaintiffs with no guidelines to which they should conform their behavior. Because of its conclusions as to vagueness and overbreadth, the Court addresses this issue only briefly.

houses, massage parlors, and related or similar activities." Again, this definition is overbroad, judged in relation to its legitimate applications. It clearly includes the three plaintiffs here that provide live nude entertainment, along with bath houses, massage parlors, 'love studios,' etc. But the definition also includes the Atlanta Civic Center, (and certain legitimate theatre) depending on how easily the patrons' prurient interests are appealed to, since this is a "building ... which contains ... commercial entertainment where the patron directly or indirectly is charged a fee ... [to view] a series of dance routines, strip performances or other gyrational choreography provided by the establishment which appeals to the prurient interest of the patron." (A prurient interest is a "shameful or morbid interest in nudity, sex or excretion." *Roth v. United States*, 354 U.S. 476, 487 n.20, 77 S.Ct. 1304, 1310, 1 L.Ed.2d 1498 (1957).) This definition, though not as broad as the others, is clearly far too broad.

■ That these definitions are substantially overbroad is borne out by the great overlap among the three definitions. A building which shows covered movies is both an adult book store *and* an adult theater. A single building, in which live nude dancing and strip performances are provided by a commercial establishment for patrons, is both an adult theater and an adult entertainment establishment. The overlap has a significant effect on three of the plaintiffs that provide live nude entertainment. If they are really adult theaters they may remain at their present locations as pre-existing non-conforming uses; but if they are adult entertainment establishments they are covered by the ordinance's amortization provisions.

(b) As has been seen, these definitions are dramatically overbroad, and are stripped of the language found in the Detroit ordinance which would make them susceptible to a narrowing construction.

The Court will discuss only the 'adult book store' definition as an example.

An adult book store is any building which contains books or magazines with the characteristics set out in the ordinance. Even if the Court were to narrow the ordinance by judicial construction (in fact, the Court would be doing violence to its plain and unambiguous but overbroad words), holding that the ordinance included within its adult book store definition only 'commercial establishments in the business of selling books,' the ordinance would still be far too broad, judged in relation to its legitimate scope. The definition would still include not just book stores carrying a substantial or significant portion of their stock in trade in covered books, magazines and novelties, but also the many newsstands, drug stores and book stores 'containing' or 'displaying' several publications of this type. The Atlanta ordinance lacks in its definitions many of the quantitative modifiers found in the Detroit ordinance.[22] And for the Court to attempt to construe these definitions in a constitutional fashion "could not be accomplished without wholesale rewriting of the statute, which is not our function." *Entertainment Concepts, Inc., III, v. Maciejewski, et al.,* 631 F.2d 497, 502 (7th Cir. 1980). An English judge would look for an interpretation clause here, but he would look in vain. There is none.

(3) Defendants' Response. Defendants' response to the overbreadth challenge would only exchange one constitutional vice, facial overbreadth, for either or both of two other defects: vagueness, or the delegation of overly broad and standardless discretionary power to local functionaries. While counsel for defendants have made a variety of representations to the Court as to how the ordinance will be applied, these are not the sort of concessions reasonably based on the language of the ordinance that might narrow the issues. *See Chulchian v. City of Indianapolis*, 633 F.2d 27, 31–33 (7th Cir. 1980).

---

**22.** The two ordinances are compared in Appendix I, where the gross overbreadth of the Atlanta ordinance may be seen in graphic form. In light of the Court's findings concerning this Courthouse in note 8, above, it is clear that the

Richard B. Russell Building, which houses the district court and its Clerk's Office, is an 'adult book store' under the ordinance.

Defendants state that, whether or not the ordinance definitions actually cover, for example, convenience stores which contain or display a few magazines characterized by their emphasis on specified anatomical areas, or movie theaters and hotel rooms occasionally used for the viewing of motion picture performances of specified sexual activities, defendants will apply the ordinance only to true 'hard-core' adult businesses, such as plaintiffs. But the concept of notice in the due process clause requires laws to be drawn with sufficient specificity to "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). "As a matter of due process, a law is void on its face if it is so vague that persons 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Tribe, supra*, at § 12–28, citing *Connally v. General Construction Company*, 269 U.S. 385, 391, 46 S.Ct. 126, 127, 70 L.Ed. 322 (1926). The ordinance as defendants would have the Court construe it is void for vagueness. Plaintiffs and other adult businesses must not locate within 1,000 feet of another adult business. In order to conform their behavior to the ordinance they must be able to identify other adult businesses. Defendants' interpretation of the ordinance provides no guidelines to replace the overly broad definitions of the ordinance itself. Such an attempted construction of an adult movie zoning ordinance was rejected by the Seventh Circuit Court of Appeals in *Entertainment Concepts, Inc. III v. Maciejewski, supra*, 631 F.2d at 502.

The Village attempts to narrow the scope of the ordinance in its brief and oral argument. While admitting that there is no support for such a construction on the face of the ordinance, the Village asserts that it considers "adult" to encompass "movies that are qualitatively different (*i. e.*, sexually explicit) than those [the plaintiff] has been showing for the past eleven months." Even if this were an adequate definition, resort to bootstrapping is no substitute for a legislative definition of the term "adult." Nor could a judicial construction of the ordinance be accomplished without wholesale rewriting of the statute, which is not our function. *See Smith v. Goguen*, 415 U.S. 566 at 575, 94 S.Ct. 1242 at 1248, 39 L.Ed.2d 605 (1974); Amsterdam, *The Void-For-Vagueness Doctrine in the Supreme Court*, 109 U.Pa.L.Rev. 67, 73–74 n.34 (1960).

Nor can defendants be permitted to prevail on the argument that the ordinance will be applied by City zoning personnel, police officers and municipal court judges in a constitutional fashion on a case-by-case basis. Such an argument would result in both (a) a due process/vagueness violation in that the ordinance "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application," *Grayned v. City of Rockford, supra*, 408 U.S. at 108–09, 92 S.Ct. at 2299; and (b) a First Amendment facial overbreadth problem, in that conduct requiring approval by zoning officials is subject to a zoning ordinance that has "delegated standardless discretionary power to local functionaries, resulting in virtually unreviewable prior restraints on First Amendment rights." *American Mini Theatres, supra*, 427 U.S. at 60, 96 S.Ct. at 2447. *See also Entertainment Concepts, Inc. III, supra*, 631 F.2d at 501–02. These constitutional vices are no improvement over the ordinance's true defect, that of overbreadth. *Tribe, supra*, at § 12–26.

Since the overbreadth of these definitions is both real and substantial, since the overbreadth is likely to have a significant deterrent effect on the availability in Atlanta of non-obscene but erotic publications and entertainment, since the definitions are not at all capable of narrowing construction without wholesale rewriting, and since the City's proffered constructions simply result in different constitutional problems of the same magnitude, this Court concludes that the definitions of adult businesses, which provide the basis for the ordinance's zoning provisions, are void on their face for over-

breadth. While the Court is reluctant to use such 'strong medicine,' respect for First Amendment values forces the Court to conclude that in this instance, determining that the ordinance is invalid "without regard to the permissibility of some regulation on the facts of particular cases . . . [avoids] making vindication of freedom of expression await the outcome of protracted litigation." *Dombrowski v. Pfister, supra*, 380 U.S. 479 at 487, 85 S.Ct. 1116 at 1121, 14 L.Ed.2d 22 (1965).

**F. The First Amendment and Public Access**

Crucial to the Supreme Court's decision in *American Mini Theatres* was its determination that Detroit's adult theater zoning ordinance had a minimal impact on First Amendment interests.

> The ordinances are not challenged on the ground that they impose a limit on the total number of adult theaters which may operate in the City of Detroit. There is no claim that distributors or exhibitors of adult films are denied access to the market or, conversely, that the viewing public is unable to satisfy its appetite for sexually explicit fare. Viewed as an entity, the market for this commodity is essentially unrestrained.

*Young v. American Mini Theatres, Inc., supra*, 427 U.S. at 62, 96 S.Ct. at 2448. The majority, in fact, qualified its holding that the Detroit ordinance did not violate the Equal Protection clause by stating that what was ultimately at issue was "nothing more than a limitation on the place where adult films may be exhibited,[35] . . ." *Id.*, 427 U.S. at 71, 96 S.Ct. at 2453 (footnote in original). The Court's footnote 35 began:

> The situation would be quite different if the ordinance had the effect of suppressing, or greatly restricting access to, lawful speech. Here, however, the District Court specifically found that "[t]he Ordinances do not affect the operation of existing establishments but only the location of new ones. There are myriad locations in the City of Detroit which must be over 1000 feet from existing regulated establishments. This burden on First Amendment rights is slight."

"The decision in *American Mini Theatres* thus leaves open exactly how much restraint is compatible with an essentially free market in 'adult' fare." *Tribe, supra*, § 12–18, n.9.

Justice Powell's concurrence placed even greater emphasis on the fact that the Detroit ordinance did not restrict public access to this commodity: "the central First Amendment concern remains the need to maintain free access of the public to the expression." *Id.*, 427 U.S. 77, 96 S.Ct. 2455. This concern, according to Justice Powell, prompts two inquiries:

> (i) Does the ordinance impose any content limitation on the creators of adult movies or their ability to make them available to whom they desire, and (ii) does it restrict in any significant way the viewing of these movies by those who desire to see them? On the record in this case, these inquiries must be answered in the negative. At most the impact of the ordinance on these interests is incidental and minimal. Detroit has silenced no message, has invoked no censorship, and has imposed no limitation upon those who wish to view them. The ordinance is addressed only to the places at which this type of expression may be presented, a restriction that does not interfere with content. Nor is there any significant overall curtailment of adult movie presentations, or the opportunity for a message to reach an audience. On the basis of the District Court's finding, *ante*, at 2453, n. 35, it appears that if a sufficient market exists to support them the number of adult movie theaters in Detroit will remain approximately the same, free to purvey the same message. To be sure some prospective patrons may be inconvenienced by this dispersal. But other patrons, depending upon where they live or work, may find it more convenient to view an adult movie when adult theaters are not concentrated in a particular section of the city.

*Id.*, 427 U.S. at 78–79, 96 S.Ct. at 2456 (citations omitted).

In the action before this Court, however, the effect of the ordinance is substantially different on public access in Atlanta to sexually-oriented publications and entertainment. As noted in Part IV.D. of this order, above, the effect of this ordinance will be (1) to immediately drastically reduce, or eliminate, public access to live, sexually-oriented entertainment; and (2) to gradually reduce the availability to the public in Atlanta of non-obscene but erotic movies and books. The effect of the ordinance would be to greatly restrain the 'commodity' of sexually explicit fare.

The ordinance 'amortizes' all existing adult entertainment establishments in Atlanta out of their present locations and into zones where, at most, one-third of them could find suitable locations. Zoning is usually general and prospective in nature. *Bayou Landing, Ltd. v. Watts*, 563 F.2d 1172, 1175 (5th Cir. 1977), cert. den. 439 U.S. 818, 99 S.Ct. 79, 58 L.Ed.2d 109 (1978). While Georgia law permits municipalities to terminate, over time, pre-existing nonconforming uses, such ordinances should be carefully scrutinized where First Amendment interests are affected. *See Ellwest Stereo Theaters Incorporated of Texas v. Byrd*, 472 F.Supp. 702 (N.D.Tex.1979). Most adult zoning ordinances passed in the wake of *Young v. American Mini Theatres, Inc.*, have contained grandfather clauses permitting pre-existing, nonconforming uses as to all regulated adult businesses. *See, e. g., Bayside Enterprises, Inc. v. Carson*, 450 F.Supp. 696, 702 n.9 (M.D.Fla.1978), and *Genusa v. City of Peoria*, 619 F.2d 1203, 1212 n.18 (7th Cir. 1980). *But see Ellwest Stereo Theaters Incorporated of Texas v. Byrd, supra*, 472 F.Supp. at 706. The effect of the ordinance challenged here on adult entertainment establishments in Atlanta is to squeeze them out of their present, desirable locations and to force them into spaces where they won't fit, or which are otherwise unsuitable for such businesses. Public access to live, sexually-oriented entertainment under the ordinance will be reduced dramatically or eliminated altogether. While this Court is not prepared to formulate a standard which answers the question left open in *American Mini Theatres*, this

Court does conclude that the ordinance restricts public access to presumptively-protected entertainment far too much. The ordinance's amortization provisions, combined with its zoning area provisions, are void for greatly restricting public access to speech protected by the First Amendment.

The fact that the ordinance requires all new adult book stores and theaters to locate in M–1, M–2 and C–4 areas of the City of Atlanta likewise offends the First Amendment. The Court has found that very few feasible sites exist in those areas in which new adult businesses could legally locate. Aside from the fact that such businesses would likely languish in the industrial areas of the city (for, as noted above, industrial areas are not close to residential areas or downtown hotels, they are poorly lit, they lack parking, and there is little traffic and no retail business there), and inconvenience to customers might drive them out of business, they would also slowly decrease in number due to a slower version of the same sort of 'squeeze' that will affect adult entertainment establishments. This also offends First Amendment principles.

In several cases from this circuit, district courts have struck down adult business zoning ordinances because the effect of the ordinance was to suppress or to significantly reduce public access to presumptively protected expression. In *E & B Enterprises v. City of University Park*, 449 F.Supp. 695 (N.D.Tex.1977), an adult zoning ordinance which lacked a grandfather clause was struck down since there were only "two areas of the city in which the prohibited-type films can be shown, one owned by the city and the other already occupied commercially," *id.*, at 697. In *Bayside Enterprises, Inc. v. Carson*, 450 F.Supp. 696 (M.D. Fla.1978), the district court invalidated an adult zoning ordinance which had a grandfather clause but which strengthened the 1,000 foot restriction from two other regulated uses (as in the Detroit ordinance), to a 2,500 foot distance requirement from any church, school or other adult business. The court there concluded that "the zoning plan as it now stands would effect, for all practical purposes, a total ban on the establish-

ment of new adult bookstores or movie houses," *id.* at 702. Since the ordinance would "effectively bar future access to the adult entertainment market," it could not be sustained. A similar suppression or great restriction on public access to presumptively protected material was instrumental in the demise of Houston's adult business zoning ordinance. *Universal Amusement Company, Inc. v. Hofheinz, et al.,* Civil Action No. H–77–1178 (S.D.Tex., Oct. 5, 1977).

Since the effect of the ordinance's overall scheme of both dispersing adult businesses from each other *and* confining them to undesirable industrial areas of the city and to the downtown business district, where there are very few possible adult business locations,[23] is to greatly restrict public access to presumptively protected speech and expression, the ordinance is void for violation of the First Amendment to the Constitution.

G. Equal Protection

(1) Standing. Plaintiffs also challenge the ordinance on equal protection grounds on their own behalf. There is no question that they have standing to do so.

(2) Residence Distance Requirement. The challenged ordinance forbids adult businesses from locating "within 500 feet of the boundaries of any residential district, R–1 (residential) to A–2 (apartment), *or property used for residential purposes . . .*" (emphasis added). Vagueness questions arose at the trial concerning whether, for example, a hotel which contained at least one permanent residence, or an office building with a penthouse residence, would be 'property used for residential purposes' under the ordinance. Certainly, any single-family detached residence constitutes 'property used for residential purposes.' However, plaintiffs' equal protection argument is addressed here.

The district court in the *American Mini Theatres* case was faced with a challenge to

a 500 foot distance requirement from any "residential dwelling or rooming unit." The district court, noting that the purpose of the zoning ordinance was in part to preserve residential neighborhoods, concluded that the language did not promote that state interest, but rather effected an almost total ban on adult uses:

> While such an extreme effect might not render the restriction invalid under the equal protection clause if the City had demonstrated that its compelling interest was promoted thereby, no such showing has here been made. We conclude that the 500-foot restriction is not necessary to promote any expressed compelling state interest and is therefore invalid under the equal protection clause.

*Nortown Theatre, Inc. v. Gribbs,* 373 F.Supp. 363, 370 (E.D.Mich.1974). This holding illustrated the principle that where First Amendment interests are involved, the equal protection clause requires a very close fit between the state's legitimate interests and the means chosen to effect those interests. Implicit in the holding is the notion that Detroit could have drawn a better ordinance: if the city's interest was the preservation of residential neighborhoods then the ordinance should have required adult businesses to locate no nearer than 500 feet from areas zoned residential.

This was noted by the Supreme Court, but not, apparently, by the drafters of the Atlanta ordinance. In footnote 2 of *American Mini Theatres,* the Supreme Court observed:

> The District Court held that the original form of the 500-foot restriction was invalid because it was measured from "any building containing a residential, dwelling or rooming unit." The city did not appeal from that ruling, but adopted an amendment prohibiting the operation of an adult theater within 500 feet of any area zoned for residential use. The amended restriction is not directly challenged in this litigation.

*Young v. American Mini Theatres, Inc., supra,* 427 U.S. at 84, 96 S.Ct. at 2459, 2464 (Powell, J., concurring).

---

**23.** [C]ourts must be alert to the possibility of direct rather than incidental effect of zoning on expression, and especially to the possibility of using the power to zone as a pretext for suppressing expression, . . .

*Id.*, 427 U.S. at 52, 96 S.Ct. at 2444. *See also Bayside Enterprises v. Carson, supra,* 450 F.Supp. at 700, n.4.

■ In light of the legitimate purposes of the Atlanta adult business zoning ordinance, that is, to preserve "surrounding residential segments of neighborhoods," to avoid blight, and to reduce noise and traffic congestion in commercial areas, this Court concludes that the rational relationship between those state interests and the 500-foot restriction from "property used for residential purposes" is negligible. Moreover, the restriction greatly reduces the available sites for adult businesses, even in the industrial zones (where concern for the quality of neighborhoods is slight). Accordingly, this portion of the ordinance must be stricken as a violation of equal protection.

(3) *American Mini Theatres* Equal Protection Analysis. No single equal protection analysis garnered a majority in *Young v. American Mini Theatres, Inc.,* although five justices agreed that the Detroit ordinance did not violate the equal protection clause.[24] In Part III of the majority/plurality opinion written by Justice Stevens, the plurality, noting that "few of us would march our sons and daughters off to war to preserve the citizen's right to see 'Specified Sexual Activities' exhibited in the theaters of our choice," *id.* 427 U.S. at 70, 96 S.Ct. at 2452, indicated that certain types of expression, for example, the sexually explicit type, should be afforded less protection than other types:

> though we recognize that the First Amendment will not tolerate the total suppression of erotic materials that have some arguably artistic value, it is manifest that society's interest in protecting this type of expression is of a wholly different, and lesser, magnitude than the

interest in untrammeled political debate . . .

*Id.* While the four-justice plurality did not indicate how much protection sexually-explicit expression should be given, it did conclude that, in the absence of repression or significant restriction of public access to this expression, the city's interest in preserving the quality of its urban life adequately supported the classifications in the ordinance. Thus, there was no violation of the Equal Protection Clause of the Fourteenth Amendment.

On the other hand, Justice Powell, after determining that the ordinance did not suppress the production of, or significantly restrict public access to, adult movies, applied the four-part equal protection test from the case of *United States v. O'Brien,* 391 U.S. 367, 377, 88 S.Ct. 1673, 1679, 20 L.Ed.2d 672 (1968). Perhaps because of the lack of a clearly articulated standard in the Stevens plurality opinion,[25] Justice Powell's analysis has been most widely followed by federal courts in the wake of *American Mini Theatres. See Entertainment Concepts, Inc., III v. Maciejewski, supra,* 631 F.2d at 504; *Genusa v. City of Peoria, supra,* 619 F.2d at 1214–15; *Hart Book Stores, Inc. v. Edmisten,* 612 F.2d 821, 825 (4th Cir. 1979), cert. den. 447 U.S. 929, 100 S.Ct. 3028, 65 L.Ed.2d 1124 (1980); *Borrago v. City of Louisville,* 456 F.Supp. 30, 33 (W.D.Ky. 1978); and *Chulchian v. City of Indianapolis,* 633 F.2d 27, 31 (7th Cir. 1980). *See also Bayside Enterprises, Inc. v. Carson, supra,* 450 F.Supp. at 703; and *Universal Amusement Co., Inc. v. Hofheinz, et al., supra,* pages 14–15.

Even had this Court not previously concluded that the challenged ordinance has far more than an "incidental" impact on First Amendment interests, this ordinance could not stand under Justice Powell's equal

24. The main opinion, written by Justice Stevens, was joined in by Justices Rehnquist, White, Powell and Chief Justice Burger, except that Justice Powell did not join in Part III of the Stevens opinion, the equal protection analysis.

25. The Fourth Circuit indicates that it thinks the plurality opinion "apparently considered that classification of sexually explicit materials

would invoke only minimal scrutiny, 427 U.S. at 70–73, 96 S.Ct. at 2452–2453. Justice Powell in effect applied the same level of scrutiny in his analysis, but did so not because he considered that erotic materials deserved less protection, but because they were not actually suppressed by the zoning ordinance." *Hart Book Stores, Inc. v. Edmisten,* 612 F.2d 821, 831, n.13 (4th Cir. 1979).

protection analysis. Under his test, "a government regulation is sufficiently justified, despite its incidental impact upon First Amendment interests, 'if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction ... on First Amendment Freedoms is no greater than is essential to the furtherance of that interest.'" *Young v. American Mini Theatres, supra,* 427 U.S. at 79–80, 96 S.Ct. at 2457 (Powell, J., concurring), citing *United States v. O'Brien, supra.* There is no doubt here that the first two parts of this test are met: Atlanta has the power to zone, and it did so in this instance to further important, legitimate interests of the city. Even the third part of the *O'Brien* test is met, if the Court disregards the comments of the public on the proposed ordinance.

█ But the fourth part of the test, that the restrictions be no greater than essential to further the interests of the city, is not met. As discussed above, the cumulative effect of the ordinance will drive most adult entertainment establishments out of business, and slowly reduce the availability in Atlanta of non-obscene but erotic publications and entertainment. The restrictions are far greater than necessary to serve the city's interests in reducing the adverse effects of adult businesses.[26]

Thus, this ordinance would also fall as a violation of the equal protection clause.

## H.  Severability

█ The scheme of this ordinance is based on the three definitions of the adult businesses. As noted above, these definitions are void on their face for overbreadth.

That being the case, the Court is unable to say that any portion of the ordinance is constitutional.

## I.  Concluding Remarks

The Court is sympathetic with the stated aims of the City of Atlanta in passing this ordinance. All citizens should, however, be concerned with inroads on rights guaranteed by the First Amendment. To paraphrase Winston Churchill, the First Amendment, like a lady's virtue, is not susceptible of partial diminution. This Court does agree that steps should be taken to reduce or eliminate the undesirable side effects of adult businesses, which may very well be skirting the borderline between pornography and free expression. There is no doubt that the city may use its zoning powers to do so.

There are also other constitutional methods of achieving the city's interests that the city has chosen not to utilize. In *California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972), for example, a state liquor license regulation prohibiting certain types of explicit sexual entertainment (live and motion picture) in establishments licensed to serve liquor by the drink was upheld by the high court as a constitutional exercise of California's broad authority to regulate alcohol under the Twenty-First Amendment.[27]

The City could also have chosen to regulate those sexually-oriented businesses involving no expression, for example massage parlors, nude studios, modeling studios and the like, in manners set forth and upheld in *Stansberry v. Holmes,* 613 F.2d 1285 (5th Cir. 1980), cert. den. —— U.S. ——, 101 S.Ct. 240, 66 L.Ed.2d 112 (1980), and *Harper v. Lindsay,* 616 F.2d 849 (5th Cir. 1980).

**26.** In fact, certain aspects of the ordinance are more rationally related to an unspoken interest, that is, driving the adult businesses out of the city, than to any of the city's legitimate interests. Adult businesses, for example, are the only retail and entertainment businesses zoned into industrial areas ordinarily used for noxious uses.

**27.** The City of Atlanta contends that its regulation and amortization of adult entertainment

establishments is valid under the authority of *California v. LaRue,* but this contention is clearly without merit. First, the challenged ordinance is a zoning ordinance, not a liquor ordinance. Second, the definition of adult entertainment establishment in the ordinance makes no reference to alcohol, and includes establishments whether or not they serve liquor. *Felix v. Young,* 536 F.2d 1126 (6th Cir. 1976) is distinguishable, since cabarets by definition serve liquor.

The City of Atlanta might also have adhered more closely in its zoning ordinance to the language approved in *Young v. American Mini Theatres, Inc.* Some of the more undesirable side effects of Atlanta's adult businesses could also be curbed by stricter enforcement of state and city criminal provisions. *See Universal Amusement Company, Inc. v. Hofheinz, et al., supra*, at page 14.

. The holding paragraph from *Erznoznik v. City of Jacksonville, supra*, 422 U.S. at 217–18, 95 S.Ct. at 2277, is an appropriate conclusion:

> In concluding that this ordinance is invalid we do not deprecate the legitimate interests asserted by the City of Jackson-ville. We hold only that the present ordinance does not satisfy the rigorous constitutional standards that apply when government attempts to regulate expression. Where First Amendment freedoms are at stake we have repeatedly emphasized that precision of drafting and clarity of purpose are essential. These prerequisites are absent here.

## VI. CONCLUSION

For the reasons set forth above, the Court hereby DECLARES the Atlanta Adult Entertainment Zoning Ordinance unconstitutional in its entirety and permanently ENJOINS defendants from any further enforcement of the ordinance. Judgment shall be entered accordingly.

## APPENDIX*

### A. Adult Book Store Defined**

| | Detroit Ordinance | Atlanta Ordinance |
|---|---|---|
| SUBJECT | An establishment*** | any building or structure |
| VERB | having as a substantial or significant portion of its stock in trade | which contains or is used for the display or sale of |
| OBJECT | books, magazines and other periodicals | books, magazines, movie . films, still pictures and any and all other written materials, photographic material, novelties, devices and related sundry items |
| MODIFIER | which are distinguished or characterized by their emphasis on matters depicting, describing, or relating to 'Specified Sexual Activities' or 'Specified Anatomical Areas,' (as defined below) | which are distinguished or characterized by their emphasis on matter depicting, describing, or relating to 'Specified Sexual Activities' or 'Specified Anatomical Areas' |

### B. Adult Movie Theaters Defined

| | Detroit Ordinance | | Atlanta Ordinance |
|---|---|---|---|
| | (1) Motion Picture | (2) Mini Motion Picture | |
| SUBJECT | An enclosed building with a capacity of 50 or more persons | An enclosed building with a capacity for less than 50 persons | A building or structure |
| VERB | used for presenting | used for presenting | which is used for the viewing of |
| OBJECT | material | material | performances or activities by others, whether such performances are in the form of live shows, motion pictures, slide shows or other forms of photographic or visual display |

| | Detroit Ordinance | Atlanta Ordinance |
|---|---|---|
| MODIFIER | distinguished or characterized by an emphasis on matter depicting, describing or relating to 'Specified Anatomical Areas,' for observation by patrons therein. | which are distinguished or characterized by their emphasis on matters depicting, describing or relating to 'Specified Sexual Activities,' or 'Specified Anatomical Areas' as heretofore defined |
| SECOND CLAUSE | none | or an establishment with a segment or section devoted to the sale or display of such material. |

## C. Adult Night Clubs Defined

| | Detroit Ordinance (Group 'D' Cabaret) | Atlanta Ordinance |
|---|---|---|
| SUBJECT | A cabaret | Any building or structure |
| VERB | which features | which contains or is used for |
| OBJECT | topless dancers, go-go dancers, exotic dancers, strippers, male or female impersonators, or similar entertainers | commercial entertainment |
| MODIFIER | none | where the patron directly or indirectly is charged a fee (1) to engage in personal contact with or to allow personal contact by, employees, devices or equipment or by personnel provided by the establishment or (2) [?] views a series of dance routines, strip performances, or other gyrational choreography provided by the establishment [(1), (2) or both?] which appeals to the prurient interest of the patron |
| EXAMPLES | | to include, but not to be limited to bath houses, massage parlors, and related or similar activities. |

\* The Court has done the breakdown (including the numbering of subparts) of these definitions. *See* Part III.B. of this order, *supra* for the Atlanta ordinance provisions; the Detroit ordinance provisions are taken from the opinions in the *Young v. American Mini Theatres, Inc.* case at the district court level, 373 F.Supp. 363, the appellate court level, 518 F.2d 1014 and at the highest level, 427 U.S. 50, 96 S.Ct. 2440, 49 L.Ed.2d 310.

\*\* A second clause of this definition, "or an establishment with a segment or section devoted to the sale or display of such material," is the same in both ordinances.

\*\*\* An establishment is a "[p]lace of business. Public or private institution. State of being established." *Black's Law Dictionary,* page 390 (5th ed.1979).